UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
RACHEL BLASS,
YURIY GURARIY,
SOL GINGOLD,
DON NAGI,
MARILYN LESSER-GALE,
JOHN GUIDA,

                Plaintiffs,

    -against-

CAPITAL INTERNATIONAL SECURITIES GROUP,
SERGIO M. ROVNER, DAVID RUBIN,
KEITH FELDMAN, WILLIAM ZELAYA, JOHN ZELAYA,
AMERICAN ACCESS TECHNOLOGIES, INC.,
VICTOR E. MURRAY, RICHARD
MURRAY, BOBBY STORY, JOHN W. COONEY,
VICTOR D. PHILLIPS, JOHN PRESLEY,
STEVEN K. ROBINSON, ERIK WIISANEN,
BRIDGE BANK, LTD., HUGO SOTO, and
ANDRES MANDEL

                Defendants.

------------------------------------X

**CV 99 5738**

Case No.

BLOCK, J.

MANN, M.J.

CLASS ACTION
COMPLAINT

FILED
IN CLERKS OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ SEP. 17 1999 ★

      Plaintiffs, by their attorneys Kazlow & Kazlow, for
their Complaint, allege as follows:

      1.  This action arises under Section 10(b) of the
Securities and Exchange Act of 1934 (the "Exchange Act"), 15
U.S.C. §87(b), and the Securities and Exchange Commission ("SEC")
Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b(5); Section
17(a) of the Securities and Exchange Act of 1933, 15 U.S.C.
§77(b)(1); Section 20 of the Exchange Act, 15 U.S.C. §78(c); and

the Racketeer Influenced and Corrupt Organization Act ("RICO"),

18 U.S.C. §1962 (a), (c), and (d); common law fraud, negligent

misrepresentation, and breach of fiduciary duty.

    2.   This Court has jurisdiction pursuant to 28 U.S.C.

§1331 and supplemental jurisdiction pursuant to 28 U.S.C. §1367.

    3.   Venue is proper in this District pursuant to 28

U.S.C. §1396(b) and Section 27 of the Exchange Act, 15 U.S.C.

§7899.

## I.   THE PARTIES

    4.   Plaintiff Yuriy Gurariy is a resident of the State

of New York, Kings County, who invested in the stock of American

Access Technologies, Inc. ("American Access") and lost $50,000.

    5. Plaintiff Rachel Blass is a resident of the State of

New York, Kings County, who invested in American Access stock and

lost over $250,000.

    6.   Plaintiff Sol Gingold is a resident of the State

of New York, County of New York, who invested in American Access

stock and lost over $75,000.

    7.   Plaintiff Marilyn Lesser-Gale is a resident of the

State of New York, County of Nassau, who invested in American

Access stock and lost approximately $54,000.

    8.   Plaintiff Don Nagi is a resident of Cleveland,

Ohio, who invested in American Access stock and lost over $350,000.

9.    Plaintiff John Guida is a resident of Denver, Colorado, who invested in American Access stock and lost over $100,000.

10.    Defendant Capital International Securities Group ("Capital"), is a securities brokerage house, which, upon information and belief, is incorporated in the State of Florida, with an address at One S.E. Third Avenue, Miami, FL 33131. Capital is a member of the Securities Investors Protection Corp. ("SIPC"), the National Association of Securities Dealers ("NASD") and the Municipal Securities Rule-Making Board ("MSRB"). Capital is also a market maker in the stock of American Access Technologies Corp. ("American Access").

11. Defendant Sergio M. Rovner ("Rovner") is an investment consultant with Capital. Rovner is licensed in the State of New York as a broker, and is a member of NASD. Upon information and belief, Rovner currently resides in the State of New York, County of New York.

12.    Defendant David Rubin ("Rubin") is an investment consultant with Capital. Rubin is licensed in the State of New York as a broker, and is a member of NASD. Upon information and

belief, Rubin currently resides in the State of New York, County
of New York.

13.   Defendant Keith Feldman ("Feldman"), upon
information and belief is a resident of the State of Florida, and
is the Director of Compliance of Capital.  Upon information and
belief, Feldman maintains a place of business at One S.E. Third
Avenue, Miami, FL 33131.

14.   Defendant William Zelaya, upon information and
belief, is the Municipal Principal of Capital. Upon information
and belief, Zelaya maintains a place of business at One S.E.
Third Avenue, Miami FL 33131.

15.   Defendant John Zelaya, upon information and belief
is a resident of the State of Florida, and is an officer/director
of Capital.  Upon information and belief, Zelaya maintains a
place of business at One S.E. Third Avenue, Miami, FL 33131.
Collectively, William and John Zelaya are referred to herein as
"the Zelayas".

16.   Defendant American Access is a telecommunications
company which, upon information and belief, was incorporated in
the State of Florida, with an address at 238 N. Westmonte Drive,
Suite 210, Altamonte Springs, FL 32714.

17.   Defendant Victor E. Murray, upon information and

belief, is a resident of the State of Florida, and was during all relevant times, and until recently, the President of American Access.  Upon information and belief, Victor E. Murray maintains a place of business at 238 N. Westmonte Drive, Suite 210, Altamonte Springs, FL 32714.

18.   Defendant Richard Murray, upon information and belief, is a resident of the State of Florida, and was during all relevant times, a director of American Access and the son of defendant Victor E. Murray.  Upon information and belief, Richard Murray maintains a place of business at 238 N. Westmonte Drive, Suite 210, Altamonte Springs, FL 32714.  Collectively, Victor E. Murray and Richard Murray are referred to herein as "the Murrays".

19.   Defendant Bobby Story ("Story"), upon information and belief, is a resident of the State of Florida and was at all relevant times a director of American Access as well as its Secretary/Treasurer and Chief Financial Officer.  Upon information and belief, defendant Bobby Story is also a principal of defendant Capital.  Upon information and belief, defendant Bobby Story maintains a place of business at 238 N. Westmonte Drive, Suite 210, Altamonte Springs, FL 32714.

20.   Defendant John W. Cooney ("Cooney"), upon

information and belief, is a resident of the State of Florida,
and during all relevant times was a director of American Access.
Upon information and belief, John W. Cooney maintains a place of
business at 238 N. Westmonte Drive, Suite 210, Altamonte Springs,
FL  32714.

21.   Defendant Steven K. Robinson ("Robinson"), upon
information and belief, is a resident of the State of Florida,
and during all relevant times was an officer/director of American
Access.  Upon information and belief, Robinson maintains a place
of business at 238 N. Westmonte Drive, Suite 210, Altamonte
Springs, FL  32714.

22.   Defendant Victor D. Phillips ("Phillips"), upon
information and belief, is a resident of the State of Florida,
and was during all relevant times a member of American Access's
Active Advisory and Consultant Board.  Upon information and
belief, Victor D. Phillips maintains a place of business at 238
N. Westmonte Drive, Suite 210, Altamonte Springs, FL  32714.

23.   Defendant John Presley ("Presley"), upon
information and belief, is presently the President of American
Access.  Upon information and belief, defendant Presley maintains
a place of business at 238 N. Westmonte Drive, Suite 210,
Altamonte Springs, FL  32714.

6

24.   Defendant Erik Wiisanen ("Wiisanen"), upon information and belief, is presently the Vice President of marketing for Omega Metal, Inc., a wholly owned subsidiary of American Access.   Upon information and belief, defendant Wiisanen maintains a place of business at 238 North Westmonte Drive, Suite 210, Altamonte Springs, FL 32714.

25.   Defendant Bridge Bank, Ltd. ("Bridge Bank") is, upon information and belief, an off-shore bank with an address at N7788 West Bay Street, Nassau, Bahamas, that has a substantial investment interest in American Access.

26.   Defendants Hugo Soto ("Soto") and Andres Mandel ("Mandel") are both principals of Bridge Bank, with a business address at N7788 West Bay Street, Nassau, Bahamas.

II.   <u>CLASS ACTION ALLEGATION</u>

27.  The plaintiffs bring this class action on behalf of themselves and all others similarly situated, as members of a proposed nationwide plaintiff class.   The proposed plaintiff class (the "Class" or "Class Members") which plaintiffs seek to represent is defined as follows: all persons or entities who purchased or otherwise acquired shares of American Access securities during the period from July, 1998 to August, 1999 (the "Class Period").   Excluded from the Class are defendants herein,

members of defendants' immediate families, any entity in which
any defendant has a controlling interest, any employees,
officers, directors of defendants, and any legal representatives,
heirs, successors, and assignees of defendants.

28.  As of February 4, 1999 the number of shares of
American Access common stock exceeded 3,000,000, and there were
approximately 622 recorded holders.  During the Class Period,
American Access common stock was listed and actively traded on an
open, developed, and efficient market.  Beneficial holders of the
shares number in the thousands, and are geographically dispersed
throughout the United States.  Thus, the Class is so numerous
that joinder of all Class Members is impracticable.  The precise
number of Class Members and their addresses are unknown to the
plaintiffs at this time, but can be ascertained from the books or
records of American Access or its agents.

29.  Plaintiffs' claims are typical of the claims of
the Class.  Plaintiffs are members of the Class they seek to
represent in that they purchased American Access common stock at
an artificially inflated price within the Class Period, and were
injured by the same wrongful conduct that injured the other Class
Members.

30.  Plaintiffs will fairly and adequately protect the

**8**

interests of the Class Members.   Plaintiffs have retained and
will retain counsel competent and experienced in class action
litigation.

31.  Common questions of law and fact exist as to all
Class Members, and predominate over any questions that solely
affect individual members of the Class.   Among the questions
common to the Class are:

(a) whether the defendants violated the federal
securities laws by the acts and conducts alleged herein;

(b) whether the defendants owed a duty to the
plaintiffs and Class Members, and whether such duty was breached
by the defendants, resulting in damages to the plaintiffs and
Class Members;

(c) whether the defendants acted with the requisite
scienter in connection with their alleged violations of the
securities laws;

(d) whether the defendants violated RICO by the acts
and conduct alleged herein; and

(e) whether the plaintiffs and the Class Members
sustained damages, and what is the appropriate measure of those
damages.

32.  A Class action is superior to other available

methods for the fair and efficient adjudication of this controversy since joinder of all Class Members is impracticable. Furthermore, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation makes it impossible for the Class to individually redress the wrongs done to them. The plaintiffs know of no difficulty that will be encountered in the management of this action that will preclude its maintenance as a Class action.

33. In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly and indirectly, used various means and instrumentalities of interstate commerce, including the United States Postal Service and interstate telephone wires and the facilities of the national securities markets, to perpetrate a fraud on the plaintiffs and Class Members.

III.   **THE NATURE OF THE ACTION**

34. This case involves a fraudulent scheme perpetrated by the defendants from around July, 1998 through August, 1999 by which the defendants manipulated the price of the stock of American Access, a company whose shares are traded publicly on Nasdaq.

35. The defendants executed their fraudulent scheme by

**10**

employing investment consultants of defendant Capital to induce some of the plaintiffs and Class Members, by means of false representations and misleading statements, to open brokerage accounts with defendant Capital.  The cash investments in those accounts were then used to manipulate and artificially inflate the price of American Access' common stock.

36.  The defendants also artificially inflated the stock price of American Access by inducing other plaintiffs and Class Members to purchase the stock directly on the open market by false representations so as to create the appearance that there was a high demand for the stock.  In addition, the false appearance of a high demand for the stock was maintained by the defendants refusals to execute sell orders for the stock of American Access during the period of time that the stock price was artificially inflated.

37.  After the stock price of American Access was artificially inflated, the defendants sold their personal holdings in the securities of American Access at a considerable profit to themselves, while the plaintiffs and Class Members suffered devastating losses when the stock price subsequently plummeted.

11

IV.  <u>THE FACTUAL BACKGROUND OF THE SCHEME</u>

38.  Defendant American Access was formed in or about 1996.  Upon information and belief, American Access is and at all relevant times was in the business of manufacturing and selling equipment for laying cable for telecommunications systems.

39.  From the outset, the financial prospects of American Access were quite uncertain.  This is due to the fact that the market for the technology and products which were developed by American Access were characterized by rapid changes and evolving standards, which often resulted in product obsolescence or short product life cycles.  Also, competitors of American Access were developing products which, upon information and belief, were functionally similar, or superior to the products of American Access.  Furthermore, there was never any assurance that American Access would be able to compete with its competitors successfully.

40.  Prior to April 13, 1999, the stock of American Access was trading on the over-the-counter market, and was quoted on the OTC Electronic Bulletin Board of NASD.  However, on April 13, 1999, the stock of American Access was scheduled to be listed on Nasdaq, as a Small Cap listing.

41.  This listing would expose American Access to a

**12**

more active public market and it would provide the defendants with an opportunity to make millions of dollars by manipulating the market price of the stock.

42.   Upon information and belief, in July, 1998, defendants Capital, Rovner, Rubin, Feldman, the Zelayas, and American Access, the Murrays, Story, Wiisanen, Cooney, Philips, Presley, Robinson, Bridge Bank, Soto, and Mandel entered into a conspiracy with each other, and agreed upon a scheme to manipulate and artificially inflate the stock price of American Access once that stock was listed on Nasdaq and to sell their personal holdings of the stock while the price was artificially inflated, thereby making millions of dollars in illegal profits.

43.   To manipulate and artificially inflate the stock price of American Access, the defendants, upon information and belief, agreed upon a three part plan.  First, they would buy shares of American Access in mass once the stock was listed on Nasdaq so that they could drive up the price of the stock. Second, they would induce large numbers of the plaintiffs and Class Members to purchase shares of American Access at the same time by means of false representations.  Third, they would refuse to execute sell orders during the time when the stock price was artificially inflated.

**13**

44.  The part of the plan which called for the
defendants to purchase shares of American Access stock in mass
would require a substantial cash reserve.

45.  To raise the cash which would be needed to
manipulate the stock price of American Access, upon information
and belief, defendants Capital, Rovner, Rubin, Feldman, the
Zelayas, and American Access, the Murrays, Story, Cooney, Philip,
Presley, Wiisanen, Robinson, Bridge Bank, Soto, and Mandel,
agreed that they would use the brokerage facilities of defendant
Capital.

46.  Capital would raise the cash needed for the
defendants to manipulate the stock of American Access by
initially having defendants Rovner, Rubin, Feldman and the
Zelayas induce some of the plaintiffs and Class Members to either
purchase shares of stock in certain companies for which Capital
was a market maker or to purchase private placement offerings for
which Capital was an underwriter.  Thereafter, the cash
investments of these plaintiffs and Class Members in those shares
of stock and private placement offerings would be liquidated,
without their consent or authorization, once the listing of
American Access on Nasdaq became effective and the cash
investments would then be used to purchase in mass shares of

**14**

American Access.

47.  Following this plan, starting in July, 1998,
defendants Capital, Rovner, Rubin, Feldman, and the Zelayas, at
the direction and acquiescence of defendants American Access, the
Murrays, Wiisanen, Story, Cooney, Phillips, Presley, Robertson,
Bridge Bank, Soto, and Mandel began selling to the plaintiffs and
Class members shares of stock of Universal Beverage Holding, Inc.
("Universal Beverage").  Capital was a market maker for the stock
of Universal Beverage.  These defendants also began selling to
the plaintiffs and Class Members private placement stock
offerings in Communicare Corp. ("Communicare"), New Millennium
Communications Corp. ("New Millennium"), DentlCare Management,
Inc. ("DentlCare"), and Advanced Lighting Solutions, Inc.
("Advanced Lighting"), the stocks for which Capital was an
underwriter.

48.  In connection with the sales of the stocks of
Universal Beverage, Communicare, DentlCare, Advance Lighting, and
New Millennium, defendants Rovner, Rubin, Feldman and the Zelayas
represented to the plaintiffs and the Class Members that
Universal Beverage, Communicare, Advance Lighting, DentlCare, and
New Millennium were good investments which would go up in value
and that the business prospects for these companies were

15

extremely good.

49.  Defendants Capital, Rovner, Rubin, Feldman, and
the Zelayas, however, failed to disclose to the plaintiffs and
Class Members that their investments in Universal Beverage,
Communicare, DenlCare, Advance Lighting, and New Millennium were
part of the defendants' fraudulent scheme to manipulate the price
of the stock of American Access.

50.  During the months of July 1998 through March 1999,
in furtherance of the fraudulent scheme to manipulate and
artificially inflate the stock of American Access, defendants
Capital, Rovner, Rubin, Feldman, and the Zelayas, at the
direction and acquiescence of defendants Murrays, Story, Cooney,
Phillips, Presley, Wiisanen, Robertson, Bridge Bank, Soto and
Mandel using the interstate mail, did mail to the plaintiffs and
the Class Members various letters, brokerage statements, and
promotional materials about Universal Beverage, Communicare,
DentlCare, Advance Lighting, and New Millennium.

51.  Also, during the months of July 1998 to March
1999, as part of the fraudulent scheme, defendants Capital,
Rovner, Rubin, Feldman, and the Zelayas, at the direction and
acquiescence of defendants Murrays, Story, Cooney, Phillips,
Presley, Wiisanen, Robertson, Bridge Bank, Soto, and Mandel,

using the interstate telephone wires, made various wire transmissions in which they represented that the stocks of Universal Beverage, Communicare, Advanced Lighting, and New Millennium were excellent investments, that the business prospects of these companies were extremely good and that these stocks would go up significantly in value.

52.  The mailings and wire transmissions were false and fraudulent in that, upon information and belief, the stocks of Universal Beverage, Communicare, New Millennium, DentlCare and Advanced Lighting were poor investments and the business outlook for these companies was questionable and that defendants Capital, Rovner, Rubin, Feldman and the Zelayas had gotten the plaintiffs and Class Members to invest in these stock as part of the defendants' fraudulent scheme.

53.  Each of the aforementioned mailings and wire transmissions were designed to, and did, defraud the plaintiffs and Class Members, and were incidental to an essential part of the defendants' fraudulent scheme.

54.  In early April, 1999, shortly before the listing of American Access on Nasdaq became effective, and to maximize their illegal profits from the manipulation of the stock price of American Access, the defendants increased their personal holdings

**17**

in the securities of American Access.

55.   Accordingly, on April 6, 1999, a registration for the issuance of 50,000 shares of Series A 10% Senior Convertible Preferred Stock of American Access became effective and a registration for 720,000 warrants for 720,000 shares of American Access common stock, exercisable at $8.00 per share, also became effective.

56.   The registration for the 720,000 warrants indicated that of the 3,265,470 shares of American Access then outstanding 1,794,735 were owned by the officers and/or directors of American Access as follows:

| Names | Number of Shares | Percent of Common Stock |
|---|---|---|
| Defendant Victor E. Murray | 400,000 | 12.28% |
| Defendant Richard A. Murray | 400,000 | 12.28% |
| Defendant Bobby E. Story | 390,000 | 11.98% |
| Defendant John Presley | 113,235 | 3.47% |
| Defendant John W. Cooney | 50,000 | 1.68% |
| Defendant Victor D. Phillips | 4,500 | .14% |
| Defendant | 437,000 | 13.24% |

Bridge Bank, Ltd.

Total        1,794,735                55.07%

57.  Upon information and belief, the defendants had
acquired their shares of American Access for approximately $0.01
per share.  The 1,794,735 shares of American Access which were
owned by the insider defendants of American Access, did not
include the warrants which they held to purchase shares of
American Access at $8.00 per share.  The warrants which the
insider defendants held were as follows: defendant Victor E.
Murray had 70,000 shares; defendant Richard Murray had 70,000
shares; defendant Robinson had 70,000 shares; defendant Story had
70,000 and defendant Presley had 25,000 shares.  Defendant
Wiisanen owned 113,235 shares of American Access stock and had
warrants for 25,000 shares.

58.  In addition, defendant Capital had warrants for
290,000 shares of American Access.

59.  On April 13, 1999, the listing of American Access
on Nasdaq became effective and the defendants went into action to
fully implement their fraudulent scheme to manipulate and
artificially inflate the stock price of American Access.

60.  First, upon information and belief, defendants
Capital, Rovner, Rubin, Feldman, and the Zelayas, at the

19

direction and acquiescence of defendants American Access, the
Murrays, Story, Cooney, Phillips, Presley, Wiisanen, Robinson,
Bridge Bank, Soto, and Mandel began liquidating the holdings of
those plaintiffs and Class Members who owned shares of Universal
Beverage, Communicare, Dentlcare, Advanced Lighting, and New
Millennium and began to purchase shares of American Access for
the accounts of the plaintiffs and Class Members.

61. The liquidation of the plaintiffs' and Class
Members cash investments in Universal Beverage, Communicare,
Dentlcare, Advanced Lighting, and New Millennium by defendants
Capital, Rovner, Rubin, Feldman and the Zelayas and the
purchasing of shares of American Access were without the consent
or authorization of the plaintiffs and Class Members.

62. The unauthorized purchases by defendants Capital,
Rovner, Rubin, Feldman and the Zelayas of the shares of American
Access were designed to, and did create the false appearance of a
demand for shares of stock of American Access which artificially
inflated the price of American Access stock on Nasdaq

63. Once the plaintiffs and Class Members discovered
that the defendants had liquidated their holdings in Universal
Beverage, Communicare, DentlCare, Advanced Lighting, and New
Millennium and had purchased shares of American Access without

**20**

their consent, the plaintiffs and Class Members began to express concerns to defendants Capital, Rovner, Rubin, Feldman and the Zelayas.

64.   To allay the concerns of the plaintiffs and Class Members, defendants Capital, Rovner, Rubin, Feldman and the Zelayas in the period from April 1999 to July 1999 repeatedly represented to the plaintiffs and Class Members that American Access was a very good investment, that the price of the stock would continue to rise, and that the plaintiffs and Class Members would receive a considerable return on their investments and they recommended to the plaintiffs and Class Members that they buy additional shares of American Access.

65.   For the purposes of executing their fraudulent scheme to manipulate the stock price of American Access, and to induce the plaintiffs and Class Members to buy additional shares of American Access during the months of April 1999 through July 1999, defendants Capital, Rovner, Rubin, Feldman, and the Zelayas, at the direction and acquiescence of defendants American Access, the Murrays, Story, Cooney, Phillips, Presley, Wiisanen, Robertson, Bridge Bank, Soto, and Mendel using the interstate mails, did mail to the plaintiffs and Class Members various letters, brokerage statements, confirmations and other materials

**21**

about American Access.

66. The mailings contained false and misleading statements about American Access in that they represented that American Access was a good investment, that the business prospects of the company were extremely good and that the plaintiffs and Class Members would realize an excellent return on their investments. The mailings did not disclose that the defendants had, and were continuing to manipulate and artificially inflate the stock price of American Access so that they could sell their personal holdings in that stock at a considerable profit.

67. During the months of April 1999 through July 1999, in furtherance of the fraudulent scheme and to induce the plaintiffs and Class Members to buy additional shares of American Access, defendants Capital, Rovner, Rubin, Feldman and the Zelayas, from Florida, at the direction and acquiescence of defendants American Access, the Murrays, Story, Cooney, Philips, Presley, and Robinson, by means of the interstate telephone wires, made several telephone calls, and sent various materials by facsimile transmission, to various plaintiffs and Class Members in New York and elsewhere.

68. In those wire transmissions, defendants Capital,

**22**

Rovner, Rubin, Feldman and the Zelayas represented that American Access was a good investment, that the stock would go up in value and that the plaintiffs and the Class Members would realize an excellent return on their investments.

69.   The representations by defendants Capital, Rovner, Rubin, Feldman, and the Zelayas contained in the wire transmissions were false and misleading in that they failed to disclose that American Access was not a good investment and that the stock price of American Access was being manipulated and artificially inflated by the defendants as part of their fraudulent scheme.

70.   Each of the aforementioned mailings and wire transmissions were designed to, and did, defraud the plaintiffs and Class Members and were incidental to an essential part of the defendants' fraudulent scheme.

71.   The plaintiffs and Class Members, in reliance upon the false representations of defendants Capital, Rovner, Rubin, Feldman and the Zelayas, were induced to purchase additional shares of American Access stock.

72.   The purchases of the additional shares of American Access by the plaintiffs and Class Members were mainly on margin, at the specific recommendations of defendants Capital, Rovner,

**23**

Rubin, Feldman, and the Zelayas.   The margin loans were provided by Pershing Securities, Inc. ("Pershing"), a division of Donaldson, Lufkin & Jenrette Securities Corporation, which acted as the clearing house for the purchase and sale of the stock of American Access.

73.   For those plaintiffs and Class Members who refused to buy American Access on margin, defendants Rovner, Rubin, Feldman, and the Zelayas fraudulently entered into margin transactions with Pershing on their behalf, without their permission and authorization.

74.   Upon information and belief, the purchases of shares of American Access stock on margin were part of the defendants' fraudulent scheme and were designed to, and did, intensify the artificial inflation of the stock price of American Access.

75.   At the same time that the defendants were making unauthorized purchases of the stock of American Access on behalf of the plaintiffs and Class Members, they put into action the second part of their plan to artificially inflate the stock of American Access.

76.   Defendants Rovner, Rubin, Feldman and the Zelayas, at the direction and acquiescence of defendants American Access,

**24**

the Murrays, Wiisanen, Story, Cooney, Phillips, Presley,
Robertson, Bridge Bank, Soto and Mandel, began an aggressive
campaign to get other plaintiffs and Class Members to buy large
amounts of the shares of American Access.

77.   Using the appearance of a heavy demand for the
stock of American Access which they had created by the
unauthorized purchases of the stock, defendants Capital, Rovner,
Rubin, Feldman and the Zelayas represented to these other
plaintiffs and Class Members that the stock of American Access
would continue to go up and that the appreciation of the stock
was due to the fact that it was an excellent investment and the
business prospects of the company were excellent.  Defendants
Capital, Rovner, Rubin, Feldman and the Zelayas did not disclose
that they had, and were manipulating and artificially inflating
the stock of American Access or that the appreciation in the
price of the stock was not based upon actual market condition.

78.   Based upon the foregoing false representations
which were made by defendants Capital, Rovner, Rubin, Feldman and
the Zelayas to these plaintiffs and Class Members, a large number
of them purchased large amounts of American Access stock at an
average price of $19.00 per share.

79.   The false representations by defendants Capital,

25

Rovner, Rubin, Feldman and the Zelayas which induced these plaintiffs and Class Members to purchase the shares of American Access were made variously in person, by the interstate mail and by interstate wire transmissions.

80.  Upon information and belief, as part of the defendants' fraudulent scheme, Capital refused to accept or execute any sell orders from the plaintiffs and Class Members for the shares of American Access during the months of April to June, 1999.

81.  The full coordination and implementation of all three parts of the defendants plan to manipulate and artificially inflate the stock price had a dramatic effect on the price of the stock.

82.  Indeed, as a result of the defendants' manipulation of the stock price of American Access during the months of April to June, 1999, the stock went from a low of $7-1/5 per share to a high of $22-3/4 per share on May 13,1999.

83.  Upon information and belief, during the period of April, May and June 1999, while the defendants' fraudulent scheme was fully in effect and the stock price of American Access was artificially inflated, the defendants sold substantially all of their holdings in the securities of American Access at a profit

of millions of dollars.

84.   For example, during the quarter ending June 30, 1999, the defendants had exercised 483,250 warrants, 106,500 in May and 376,750 in June, leaving a balance of 86,750 unexercised warrants.

85.   Starting in mid August, 1999, the price of the stock of American Access dropped precipitously, and margin calls went out from Pershing to the plaintiffs and Class Members.   To meet the margin calls, the holdings of those plaintiffs and Class Members, whose stock of American Access was purchased on margin, were liquidated by defendant Capital.   This accelerated the drop in the price of the stock of American Access.   As a result, the plaintiffs and Class Members lost millions of dollars from their investments in the shares of American Access.   In fact, from August 19, 1999 to August 20, 1999, the stock price of American Access plummeted from $16 per share back to $7-½ per share.

86.   In response to this precipitous decline in the stock price of American Access, on August 23, 1999, defendant American Access issued a press release signed by defendant John Presley, as president.

87.   That press release stated as follows:

The company was informed that a large block of stock

**27**

has been liquidated as a result of margin calls, causing an imbalance in trading....

We believe it is important for our shareholders to know that the insiders have not been selling the stock during this period.  The Company has been advised that several large blocks of American Access stock held in margin accounts were liquidated due to margin calls.  The large number of shares involved, when thrown into our normal trading activity, has at least partially caused this imbalance in trading.

88.  The press release made no mention of the defendants' fraudulent scheme or that defendants' Capital, Rovner, Rubin, Feldman and the Zelayas had, without authorization, purchased shares of stock for certain of the plaintiffs and Class Members or that among the shares of American Access which were being liquidated to meet the margin calls were those shares of American Access which these defendants had purchased for the plaintiffs and Class Members on margin without their authorization.

## AS AND FOR A FIRST CLAIM FOR RELIEF
(Violation of Section 10(b) of the
Securities and Exchange Act of 1934, and Rule 10-b(5)
Against All Defendants)

89.  The plaintiffs, on behalf of themselves and all other Class Members, repeat and reallege the allegations contained in paragraphs 1 through 88 as if fully set forth herein.

90.   American Access is a security within the meaning of the Exchange Act, 15 U.S.C. §78(c).

91.   The defendants, severally and in concert, directly and indirectly, participated and conspired with one another to participate in a course of conduct to manipulate the market for the stock of American Access in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §78(j), and in contravention of Rule 10b-5 promulgated thereunder.

92.   The defendants, continuing throughout the Class Period, by use of the mails and other means and instruments of interstate commerce:

(a) employed manipulative and deceptive devices, contrivances, schemes, and artifices, to defraud the plaintiffs and Class Members in connection with the sale and purchase of the stock of American Access;

(b) made untrue statements of facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, in that the defendants failed to disclose that they were manipulating the market for the stock of American Access and that they would, and did sell their holdings in that stock at a considerable profit to themselves; and

(c) engaged in acts and manipulative practices which operated as a fraud or deceit upon the plaintiffs and Class Members, all in violation of Section 10(b) of the Exchange Act and Rule 10-b promulgated thereunder.

94.   The defendants knew or had reason to know that the devices, contrivances, schemes and artifices were fraudulent at the time they employed them, or employed them in reckless disregard thereof, and employed them for the purpose and with the intent to deceive and defraud the plaintiffs and Class Members, or in reckless disregard of the interests of the plaintiffs and Class Members.

95.   The purchases of the shares of American Access by the plaintiffs and Class Members were made in reliance upon the manipulative and deceptive devices, contrivances, schemes and artifices employed by the defendants, and in reliance on the integrity of the market for the securities of American Access.

96. As a direct and proximate result of the foregoing, the plaintiffs and Class Members have suffered damages in an amount to be proven at trial but which is believed to be in excess of $30,000,000.00.

## AS FOR A SECOND CLAIM FOR RELIEF
[Violation of Section 10(b) of the Securities Exchange
Act of 1934, and Rule 10-b(5)against defendants Rovner,
Rubin, Feldman, and the Zelayas]

97.  The plaintiffs, on behalf of themselves and all
other members of the proposed Class, repeat and reallege the
allegations contained in paragraphs 1 through 96 as if fully set
forth herein.

98.  At all relevant times hereinafter mentioned,
defendants Rovner, Rubin, Feldman, and the Zelayas had a duty not
to use or employ in connection with the purchase and sale of any
securities registered on a national securities exchange, or any
securities not so registered, any manipulative or deceptive
devices or contrivances in contravention of the rules and
regulations promulgated by the Securities & Exchange Commission
as necessary and appropriate in the public interest or for the
protection of investors.

99.  By means and instrumentalities of interstate
commerce mail and wires, and the facilities of a national
securities exchange, defendants Rovner, Rubin, Feldman, and the
Zelayas, from July, 1998 through August, 1999, engaged in a
practice and course of conduct which operated as a fraud upon the
plaintiffs and the Class Members, by making untrue statements of

**31**

material fact in connection with the sale of the securities of American Access, in that these defendants represented to the plaintiffs that the stock of American Access was a good investment that would go up in value, and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in that these defendants failed to disclose that they were part of a scheme to manipulate and artificially inflate the stock price of American Access, so that Capital could sell its personal holdings in the stock at a considerable profit.

100. The purchases of the stock of American Access by the plaintiffs and Class Members were made in reliance upon the manipulative and deceptive devices, contrivances, schemes, and artifices employed by these defendants, and in reliance on the integrity of the market for the securities of American Access.

101. Defendants Rovner, Rubin, Feldman, and the Zelayas knew and had reason to know that the devices, contrivances, schemes and artifices were fraudulent at the time they employed them, or employed them with reckless disregard thereof, and employed them for the purpose and with the intent to deceive and defraud the plaintiffs and Class Members, or in reckless disregard of the interests of the plaintiffs and Class Members.

**32**

102. For their participation in the fraudulent scheme, defendants Rovner, Rubin, Feldman, and the Zelayas received various kickbacks and remuneration from Capital.

103. As a direct and proximate result, the plaintiffs and Class Members have been damaged in an amount to be determined at trial but which is believed to be in excess of $30,000,000.00.

<u>AS AND FOR A THIRD CLAIM FOR RELIEF</u>
[Against Defendant Capital For
Controlling Person Liability Under
Section 20(a) of the Securities and Exchange Act,
15 U.S.C. §78t(a)]

104. The plaintiffs, on behalf of themselves and all other members of the proposed Class, repeat and reallege the allegations contained in paragraphs 1 through 96, as if fully set forth herein.

105. Defendants Rovner, Rubin, Feldman, and the Zelayas committed securities fraud in violation of 10-b of the Securities and Exchange Act of 1934 and Rule 10-b(5) promulgated thereunder by using or employing deceptive devices, contrivances, schemes and artifices in the purchase and sale of securities registered on a national securities exchange.

106. Defendant Capital was a controlling person of defendants Rovner, Rubin, Feldman, and the Zelayas, within the meaning of Section 20(a) of the Securities and Exchange Act, 15

U.S.C. §78t, at the time that defendants Rovner, Rubin, Feldman,
and the Zelayas committed the aforementioned securities law
violations in that Capital employed defendants Rovner, Rubin,
Feldman, and the Zelayas.

107. As such, defendant Capital possessed the power to
direct or cause the direction of the management, conduct,
policies and activities of defendants Rovner, Rubin, Feldman, and
the Zelayas.

108. Defendant Capital, by being a controlling person
of defendants Rovner, Rubin, Feldman, and the Zelayas, is jointly
and severally liable for the damages which the plaintiffs and
Class Members suffered due to Rovner's, Rubin's, Feldman's, and
the Zelayas' violations of the securities statutes, rules and
regulations aforementioned.

109. As a result, defendant Capital is liable to the
plaintiffs and Class Members for damages in an amount to be
determined at trial but which is believed to be in excess of
$30,000,000.00.

### AS AND FOR A FOURTH CLAIM FOR RELIEF
(Fraudulent Sale of Securities Under Section
17(a) of the Securities Act of 1933)
(Against Defendants Capital, Rovner,
Rubin, Feldman, and the Zelayas)

110.  The plaintiffs, on behalf of themselves and all

**34**

other members of the proposed Class, repeat and reallege the allegations contained in paragraphs 1 through 109, as if fully set forth herein.

111.  The stock of American Access constitutes a security within the meaning of Section 2(1) of the Exchange Act of 1933, 15 U.S.C. §77(b)(1).

112.  Defendants Capital, Rovner, Rubin, Feldman, and the Zelayas offered and sold shares of stock of American Access to the plaintiffs and Class Members and in connection thereto, these defendants made use of the United States mails, interstate wires, and other means and facilities of interstate commerce.

113.  Defendants Capital, Rovner, Rubin, Feldman, and the Zelayas, in proposing the sale of the shares of stock of American Access and consummating those sales, directly and indirectly: (1) employed a device, scheme, and artifice to defraud the plaintiffs and Class Members; (2) obtained money and property by means of untrue statements of material facts and by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading and (3) engaged in a transaction, practice, and course of business that operated as a fraud and deceit upon the plaintiffs and Class Members, the purchasers of

35

securities, all in violation of Section 17(a) of the Exchange Act of 1933, 15 U.S.C. §77(a).

114.  As a direct and proximate result, the plaintiffs and Class Members have been damaged in an amount to be determined at trial, but which is believed to be in excess of $30,000,000.00.

### AS AND FOR A FIFTH CLAIM FOR RELIEF
(Civil RICO, 18 U.S.C.§ 1962(a)
Against All Defendants)

115.  The plaintiffs, on behalf of themselves and all other Class Members, repeat and reallege the allegations contained in paragraphs 1 through 116, as if fully set forth herein.

116. At all relevant times, defendant Capital was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

117. At all relevant times, defendant American Access was a "person" within the meaning of 18 U.S.C. §§1961(3) and 1964(c).

118. At all relevant times, defendant Capital and American Access were an associated-in-fact enterprise as defined by 18 U.S.C. § 1961(4), that was and is engaged in, and the activities of which affect, interstate commerce.

119. The enterprise shared the common purpose of

manipulating the market for the securities of American Access so
that the defendants could sell their holdings in those securities
at considerable profits to themselves.

120. The enterprise also has and had an existence and
economic goal separate from the pattern of racketeering activity,
in that among other activities, Capital was and is engaged in the
legitimate business and legal activity of being a brokerage
house, and American Access was and is engaged in the legitimate
business and legal activity of selling cable equipment.

121. The defendants, Capital, Rovner, Rubin, Feldman
and the Zelayas, American Access, the Murrays, Story, Cooney,
Phillips, Presley, Wiisanen, Robertson, Bridge Bank, Soto, and
Mendel, each knowingly and wilfully invested income or the
proceeds of income derived from a "pattern of racketeering
activity" in the enterprise to conduct and maintain its affairs
within the meaning of 18 U.S.C. §§1961(1)(B) and 1961(5) and
1962(a).

122. The "pattern of racketeering activity" consisted
of acts of mail and wire fraud in violation, respectively, of
18 U.S.C. §§1341 and 1343, as set forth above. The acts of mail
and wire fraud were interrelated by virtue of their common
participants, common victims (namely the plaintiffs and the Class

**37**

Members), common method of commission, their common purpose and result of defrauding the plaintiffs and Class Members out of millions of dollars, thereby enriching the defendants.

123. By reason of the violation of 18 U.S.C. §1962(a) committed by the defendants, the plaintiffs and Class Members were injured in an amount to be determined at trial, but which is believed to be in excess of $30,000,000.00.

124. Pursuant to 18 U.S.C. §1964(c), the plaintiffs and Class Members are entitled to treble their general damages and special compensatory damages, and to an award of interest, costs and attorneys fees, by reason of the defendants' violation of 18 U.S.C. §1962(a).

<u>AS FOR THE SIXTH CAUSE OF ACTION</u>
(Civil RICO, 18 U.S.C. §1962(c)
Against All Defendants)

125. The plaintiffs, on behalf of themselves and all other Class Members, repeat and reallege the allegations contained in paragraphs 1 through 124, as if fully set forth herein.

126. At all relevant times, defendant Capital was a "person" within the meaning of 18 U.S.C. §§1961(3) and 1964(c).

127. At all relevant times, defendant American Access was a "person" within the meaning of 18 U.S.C. §§1961(3) and

1964(c).

128. At all relevant times, defendants Capital and American Access were an associated-in-fact enterprise as defined by 18 U.S.C. §1961(4), that was and is engaged in, and the activities of which affect, interstate commerce.

129. The enterprise shared the common purpose of manipulating the market for the securities of American Access so that the defendants could sell their holdings in those securities at considerable profits to themselves.

130. The enterprise also has, and had, an existence and economic goal separate from the pattern of racketeering activity, in that, among other activities, Capital was and is engaged in the legitimate business and legal activity of being a brokerage house, and American Access was and is engaged in the legitimate business and legal activity of selling cable equipment.

131. The defendants, Capital, Rovner, Rubin, Feldman, the Zelayas, and American Access, the Murrays, Story, Cooney, Phillips, Presley, Wiisanen, Robertson, Bridge Bank, Soto, and Mandel, each knowingly and willingly associated with the associated-in-fact enterprise, and did conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs, through a "pattern of racketeering activity" within the

meaning of 18 U.S.C. §§1961(1)(B), 1961(5), and 1962(c).

132. The "pattern of racketeering activity" consisted of acts of mail and wire fraud in violation, respectively, of U.S.C. §§ 1341 and 1343, as set forth above. The acts of mail and wire fraud were interrelated by virtue of their common participants, common victims (namely the plaintiffs and Class Members), common method of commission, and their common purpose and result of defrauding the plaintiffs and Class Members out of millions of dollars, thereby enriching the defendants.

133. By reason of the violation of 18 U.S.C. §1962(c) committed by the defendants, the plaintiffs and Class Members were injured in an amount to be determined at trial, but which is believed to be in excess of $30,000,000.00.

134. Pursuant to 18 U.S.C. §1964(c), the plaintiffs and Class Members are entitled to treble their general damages and special compensatory damages, plus interests, costs and attorneys fees, by reason of the defendants violation of 18 U.S.C. §1962(c).

AS AND FOR A SEVENTH CLAIM FOR RELIEF
(Civil RICO, 18 U.S.C.§ 1962(d)
Against All Defendants)

135. The plaintiffs, on behalf of themselves and all other Class Members, repeat and reallege the allegations

**40**

contained in paragraphs 1 through 134, as if fully set forth herein.

136. At all relevant times, defendant Capital was a "person" within the meaning of 18 U.S.C. §§1961(3) and 1964(c).

137. At all relevant times, defendant American Access was a "person" within the meaning of 18 U.S.C. §§1961(3) and 1964(c).

138. At all relevant times, defendants Capital and American Access were an associated-in-fact enterprise as defined by 18 U.S.C. §1961(4), that was and is engaged in, and the activities of which affect, interstate commerce.

139. The enterprise shared the common purpose of manipulating the market for the securities of American Access so that the defendants could sell their holdings in those securities at considerable profits to themselves.

140. The defendants Capital, Rovner, Rubin, Feldman, the Zelayas, and American Access, the Murrays, Story, Cooney, Phillips, Presley, Wiisanen, Robertson, Bridge Bank, Soto, and Mandel, each knowingly and willfully invested income or the proceeds of income derived from a "pattern of racketeering activity" in the enterprise to conduct and maintain its affairs within the meaning of 18 U.S.C. §§1961(1)(B) and 1961(5) and

**41**

1962(a) and each knowingly and willfully associated with the enterprise, and did conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs, through a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§1961(1)(B) and 1961(5) and 1962(c).

141. At all relevant times, defendants Capital, Rovner, Rubin, Feldman, the Zelayas, American Access, the Murrays, Story, Cooney, Phillips, Presley, Wiisanen, Robertson, Bridge Bank, Soto, and Mandel, each were associated with the enterprise, and agreed and conspired to violate 18 U.S.C. §§1962(a) and (C ) in that they agreed to invest income or the proceeds of income derived from a "pattern of racketeering activity" in the enterprise, to conduct and maintain its affairs, and to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §1962(d).

142. At all relevant times, defendants Capital, Rovner, Rubin, Feldman, the Zelayas, American Access, the Murrays, Story, Cooney, Phillips, Presley, Wiisanen, Robertson, Bridge Bank, Soto, and Mandel, have committed and caused to be committed overt predicate acts of wire and mail fraud in violation, respectively, of U.S.C. §§1341, with knowledge that such acts were in

furtherance of the conspiracy.

143. By reason of the violation of 18 U.S.C. §1962(d) committed by the defendants, the plaintiffs and Class Members were injured in an amount to be determined at trial, but which is believed to be in excess of $30,000,000.00.

144. Pursuant to 18 U.S.C. §1964(c), the plaintiffs and Class Members are entitled to treble their general damages and special compensatory damages, and to award interest, costs and attorneys fees, by reason of the defendants' violation of 18 U.S.C. §1962(d).

AS AND FOR A EIGHTH CLAIM FOR RELIEF
(For Common-law Fraud Against Rovner,
Rubin, Feldman and the Zelayas)

145. The plaintiffs, on behalf of themselves and all other members of the proposed Class, repeat and reallege the allegations contained in paragraphs 1 through 144 as if fully set forth herein.

146. Defendants Rovner, Rubin, Feldman, and the Zelayas, each for himself, and on behalf of defendant Capital, during the months of April and May, 1999, made false representations to the plaintiffs and Class Members that the stock of American Access was a good investment and that they would appreciate in value.

147. These representations were false and misleading in that defendants Rovner, Feldman, and the Zelayas knew American Access was not a good investment and that they had manipulated the market price of the stock so as to artificially inflate the price of the stock so that they could sell their personal holdings in those stocks at a considerable profit to themselves.

148. Defendants Rovner's, Rubin's, Feldman's, and the Zelayas's misrepresentations, omissions, and concealment of material fact were made intentionally or recklessly for the purpose of inducing the plaintiffs and Class Members to purchase shares of American Access.

149. The plaintiffs and Class Members reasonably and justifiably relied to their detriment on the truthfulness of the representations by defendants Rovner, Rubin, Feldman, and the Zelayas and on the completeness of the disclosure of material fact by these defendants.

150. Defendants had a special relationship of trust and confidence with the plaintiffs and Class Members and knew or should have known that the plaintiffs and Class Members would rely upon their representations and upon the integrity of the market for the securities of American Access. But for these defendants' misrepresentations, omissions, and concealment of

material fact, the plaintiffs and Class Members would not have purchased shares of the stock of American Access.

151.   As a result, the plaintiffs and Class Members have been damaged in an amount to be determined at trial, but which is believed to be in excess of $30,000,000.00, plus punitive damages since the conduct of defendants Capital, Rovner, Rubin, and Zelayas was knowing, intentional and malicious, and was in total disregard for the rights and interests of the plaintiffs and Class Members.

## AS AND FOR A NINTH CLAIM FOR RELIEF
(For Breach of Fiduciary Duty)
(Against Defendants Capital,
Rovner, Rubin and the Zelayas)

152.   The plaintiffs, on behalf of themselves and all other members of the Class, repeat and reallege the allegations contained in paragraphs 1 through 151, as if fully set forth herein.

153.   Defendants Capital, Rovner, Rubin, Feldman, and the Zelayas undertook to act primarily for the plaintiffs and Class Members in determining which investments would be in their best interests.

154.   The plaintiffs and Class Members reasonably relied upon defendants Capital's, Rovner's, Rubin's, Feldman's

45

and the Zelayas' representations and promises that they would

independently and objectively advise the plaintiffs and Class

Members on all investments, and that they would disclose all

material information about the investments that they would

recommend to the plaintiffs and Class Members.  The

representations and promises of these defendants, and the

plaintiffs' and Class Members' foreseeable and reasonable

reliance on them, gave rise to a fiduciary relationship between

these defendants and the plaintiffs and Class Members.

155. Defendants Capital, Rovner, Rubin, and Feldman

owed the plaintiffs and Class Members fiduciary duties of

loyalty, utmost good faith and integrity, to make full and

accurate disclosure of material facts about all investments, to

abstain from self-dealing in any of the stock which they

recommended to the plaintiffs and Class Members, and to exercise

the care, skill, and diligence in the recommendations made to the

plaintiffs and Class Members that a reasonably prudent person

would exercise in regard to his own property.

156.  Defendants Capital, Rovner, Rubin, Feldman, and

the Zelayas breached the duty to disclose fully all material

facts relating to the stock of American Access, including the

fact that they were part of a fraudulent scheme to manipulate the

**46**

market price of American Access, so that they could artificially

inflate the price of the stock and sell their personal holdings

in that stock at a considerable profit.

157.   As a proximate result of the breach of such

fiduciary duty, the plaintiffs and Class Members have been

damaged in an amount to be determined at trial, but which is

believed to be in excess of $30,000,000.00

### AS AND FOR A TENTH CLAIM FOR RELIEF
(For Negligent Misrepresentation)
(Against Capital, Rovner, Rubin, and the Zelayas)

158.   The plaintiffs, on behalf of themselves and all

other members of the proposed Class, repeat and reallege the

allegations contained in paragraphs 1 through 157, as if fully

set forth herein.

159.   In making the representations and omissions

alleged above, defendants Capital, Rovner, Rubin, and the Zelayas

acted without any reasonable grounds for believing the

representations that they made to be true.

160.   Plaintiffs and Class Members were ignorant of the

falsity of these statements, and believed them to be true.   In

actual and justifiable reliance upon said omissions and

misrepresentations of material fact, and on the integrity of the

market for the shares of American Access, the plaintiffs and

Class Members were induced to, and did invest in the stock of American Access.  Had the plaintiffs and Class Members known the true facts, they would not have invested in those stocks.

161.  As a direct and proximate result of the foregoing conduct, plaintiffs and each member of the Class have been damaged in an amount to be determined at trial, but which is believed to in excess of $30,000,000.00.

WHEREFORE, the plaintiffs request, on their behalf and on behalf of all those similarly situated:

1.  An order certifying the proposed Class Action herein under Federal Rule of Civil Procedure 23(a) and appointing plaintiffs, and their counsel of record to represent said Class;

2.  Judgment against all defendants jointly and severally (a) on the FIRST claim for damages in an amount to be determined at trial, but is believed to be in excess of $30,000,000.00; (b) against defendants Rovner, Rubin, Feldman, and the Zelayas jointly and severally on the SECOND claim for damages in an amount to be determined at trial but is believed to be in excess of $30,000,000.00; (c) against defendant Capital on the THIRD claim for damages in an amount to be determined at trial but is believed to be in excess of $30,000,000.00; (d) against defendants Capital, Rovner, Rubin, Feldman, and the

**48**

Zelayas, jointly and severally on the FOURTH claim for damages in an amount to be determined at trial but is believed to be in excess of $30,000,000.00; (e) against all defendants jointly and severally on the FIFTH, SIXTH, and SEVENTH claims for damages in an amount to be determined at trial but believed to be in excess of $30,000,000.00, plus treble damages; (f) against Rovner, Rubin, Feldman, and the Zelayas jointly and severally, on the EIGHTH, NINTH and TENTH claims for damages in an amount to be determined at trial but believed to be in excess of $30,000,000.00, plus punitive damages on the EIGHTH claim for damages.

       3.   Any additional and consequential damages suffered by the plaintiffs and members of the Class;

       4.   Attorneys' fees;

       5.   Pre-judgment interest;

       6.   Costs of suit; and

       7.   Such other and further legal and equitable relief as this Court may deem to be just and  proper.

Dated: New York, New York
      September 13, 1999

KAZLOW & KAZLOW

By: _____

Victor A. Worms (VAW-2234)
19 West 34th Street
New York, New York 1001
(212) 947-2900

P:\USERS\SHAMMER\NATALIA\CAPITAL\COMPLAIN.WPD

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------X
RACHEL BLASS,                              :
YURIY GURARIY,                             :
SOL GINGOLD,                               :
DON NAGI,                                  :
MARILYN LESSER-GALE,                       : Case No.
JOHN GUIDA,                                :
                    Plaintiffs,            :
                                           : CERTIFICATION
-against-                                  :
                                           :
CAPITAL INTERNATIONAL SECURITIES GROUP,    :
SERGIO M. ROVNER, DAVID RUBIN,             :
KEITH FELDMAN, WILLIAM ZELAYA, JOHN ZELAYA,:
AMERICAN ACCESS TECHNOLOGIES, INC.,        :
VICTOR E. MURRAY, RICHARD                  :
MURRAY, BOBBY STORY, JOHN W. COONEY,       :
VICTOR D. PHILLIPS, JOHN PRESLEY,          :
STEVEN K. ROBINSON, ERIK WIISANEN,         :
BRIDGE BANK, LTD., HUGO SOTO, and          :
ANDRES MANDEL                              :
                                           :
                    Defendants.            :
                                           :
--------------------------------------------X


STATE OF NEW YORK )
                  ): ss:
COUNTY OF KINGS   )

          I, Yuriy Gurariy, residing at 3111 Ocean Parkway,
Apt. 9"A", New York, New York  11235, hereby certify as follows:

          1.  I am one of the plaintiffs in this action and I

have read the foregoing complaint.  The complaint is as to my

personal knowledge, except as to the matters stated upon

information and belief and as to those matters, I believe them to

be true.

2.   I wish to serve as a representative party on behalf of the proposed Class Members of this action, including providing testimony at deposition and trial, if necessary.  I have reviewed the complaint and I authorized its filing.

3.   I did not purchase the security that is the subject of the complaint at the direction of the plaintiffs' counsel or in order to participate in any private action arising under 15 U.S.C. §78u-4.

4.   In or about mid-August, 1999, defendants Sergio Rovner and David Rubin visited me at home and recommended that I invest in the stock of Universal Beverage Holdings Corp. ("Universal Beverage").  These defendants represented to me that Universal Beverage was a very reliable and profitable company and that my investment would go up in value.

5.   Defendants Rovner and Rubin suggested that I invest $50,000.00.  At no time did defendants Rovner and Rubin disclose to me that their recommendation to me to invest in Universal Beverage was part of a fraudulent scheme or that my cash investment in Universal Beverage would be used to manipulate the price of any other stock.

6.   Accordingly, on August 19, 1999, I brought 6,500 shares of Universal Beverage at $7-5/8 per share.

**2**

7.   On April 23, 1999, I received a statement from defendant Capital International Securities Group ("Capital") that all of my holdings in the stock of Universal Beverage were transferred to a stock of a different company named American Access Technologies, Inc.   Defendants Rovner and Rubin had purchased 2,000 shares of American Access for my account at $17-5/8 per share.   This was done without my authorization.

8.   When I questioned defendants Rovner and Rubin about their unauthorized purchase of American Access for my account, they assured me that American Access was an excellent investment and that the stock would go up in value.   Defendants Rovner and Rubin did not disclose to me that they were part of a fraudulent scheme to manipulate the stock price of American Access to artificially inflate the price of the stock so that they can sell their personal holdings in that stock at a considerable profit to themselves and others.

9.   Subsequently, in May, 1999, while I was out of the country, defendants Rovner and Rubin, without my consent or permission, entered into a margin transaction with Pershing Securities, Inc. ("Pershing"), the clearing house for the securities of American Access, for a loan in the amount of $37,000 which they used to purchased additional shares of

3

Access.

10.  In August, 1999, the stock of American Access fell precipitously and there was a margin call from Pershing.  To meet the margin call, my holdings in American Access were liquidated by defendants Capital, Rovner and Rubin at a significant loss to me.

11.  There has not been any other action during the preceding three years in which I have signed a certification to be a representative party on behalf of a class.

12.  I will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph 4 of 15 U.S.C. §78u-4.

_YURI GUKARIY_
YURI GUKARIY

Sworn to before me this
17th day of September, 1999

_____
Notary Public

F:\USERS\SHAMMER\NATALIA\CAPITAL\CERTIFIC.

Richard Delvalle
Notary Public, State of New York
No. 02DE6004969
Qualified in New York County
Commission Expires April 20, 2000

4